Citation Nr: 1438739 
Decision Date: 08/29/14 Archive Date: 09/03/14

DOCKET NO. 10-00 613 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in New Orleans, Louisiana


THE ISSUES

1. Entitlement to service connection for left ankle disability.

2. Entitlement to service connection for a left groin disability.

3. Entitlement to an initial rating higher than 50 percent for posttraumatic stress disorder (PTSD).


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


ATTORNEY FOR THE BOARD

D. Whitehead, Counsel


INTRODUCTION

The Veteran served on active duty from June 2004 to August 2005 and November 2010 to December 2011, with additional service in the Marine Corps Reserve which is presumed to include periods of active duty for training (ACDUTRA) and inactive duty for training (INACDUTRA).

These matters come before the Board of Veterans' Appeals (Board) on appeal from an August 2008 rating decision issued by the Department of Veterans Affairs (VA) New Orleans Regional Office (RO), which was located in Gretna, Louisiana at that time.

In September 2013, the Board remanded the case for additional development.

The record before the Board consists of an electronic file known as Virtual VA and an electronic file known as the Veterans Benefits Management System (VBMS).

In the September 2013 remand, the Board referred the issue of entitlement to service connection for a left foot disability, diagnosed as talar beaking, to the Agency of Original Jurisdiction (AOJ) for appropriate action. Although the record reflects that the AOJ acknowledged the referral of the claim in February 2014, it does not appear that the AOJ has undertaken any action with respect to this issue. Therefore, the issue of service connection for a left foot disability is once again referred to the AOJ for appropriate action. 

The issue of entitlement to service connection for a left ankle disability is addressed in the REMAND that follows the below ORDER.


FINDINGS OF FACT

1. Left groin strain originated in service and was present when the Veteran filed his claim for service connection for left groin disability.

2. Since the award of service connection, the social and occupational impairment from the Veteran's PTSD has not more nearly approximated deficiencies in most areas than reduced reliability and productivity.


CONCLUSIONS OF LAW

1. The criteria for service connection for a left groin disability are met. 38 U.S.C.A. § 1110 (West 2002); 38 C.F.R. § 3.303 (2013).

2. The criteria for an initial disability evaluation in excess of 50 percent for PTSD have not been met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code 9411 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2002 & Supp. 2013), and the pertinent implementing regulation, codified at 38 C.F.R. § 3.159 (2013), provide that VA will assist a claimant in obtaining evidence necessary to substantiate a claim but is not required to provide assistance to a claimant if there is no reasonable possibility that such assistance would aid in substantiating the claim.

They also require VA to notify the claimant and the claimant's representative, if any, of any information, and any medical or lay evidence, not previously provided to the Secretary that is necessary to substantiate the claim. As part of the notice, VA is to specifically inform the claimant and the claimant's representative, if any, of which portion, if any, of the evidence is to be provided by the claimant and which part, if any, VA will attempt to obtain on behalf of the claimant.

The Board also notes the United States Court of Appeals for Veterans Claims (Court) has held that the plain language of 38 U.S.C.A. § 5103(a) (West 2002) requires that notice to a claimant pursuant to the VCAA be provided "at the time" that or "immediately after" VA receives a complete or substantially complete application for VA-administered benefits. Pelegrini v. Principi, 18 Vet. App. 112, 119 (2004). The timing requirement enunciated in Pelegrini applies equally to the initial-disability-rating and effective-date elements of a service-connection claim. Dingess v. Nicholson, 19 Vet. App. 473 (2006).

The record reflects that the Veteran was provided all required notice by letter mailed in April 2008, prior to the initial adjudication of his claims. Moreover, as explained below, the Board has determined that the evidence currently of record is sufficient to substantiate the claim for service connection for left groin disability. Therefore, no further development is required before the Board decides that claim.

With respect to the PTSD claim, the record reflects that all service treatment records and available and relevant post-service medical evidence identified by the Veteran have been obtained. Neither the Veteran nor his representative has identified any outstanding, existing evidence that could be obtained to substantiate the claims. The Veteran was most recently afforded a VA examination to assess the severity of his service-connected PTSD in November 2012. The report of that examination provides all information needed for rating purposes. The Veteran has not asserted, and the evidence of record does not show, that the disability has increased significantly in severity since the examination. Finally, the Board is satisfied that there has been substantial compliance with the directives issued in the previous Board remand. See Dyment v. West, 13 Vet. App. 141, 146-47 (1999), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002).

Accordingly, the Board will address the merits of the claims.

Burden of Proof

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under laws administered by the Secretary. The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

Legal Criteria for Service Connection 

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303.

In addition, service connection may be granted for any disease diagnosed after separation, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

"Congress specifically limits entitlement to service-connected disease or injury where such cases have resulted in a disability . . . in the absence of a proof of present disability there can be no claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). The Court has held that the requirement for service connection that a current disability be present is satisfied when a claimant has a disability at the time a claim for VA disability compensation is filed or during the pendency of that claim even though the disability resolves prior to the Secretary's adjudication of the claim. See McClain v. Nicholson, 21 Vet. App. 319, 321 (2007).

Factual Background and Analysis- Left Groin Disorder

The Veteran claims that he has a left groin disorder manifested by pain and a "knot" in the left groin area due to his military service.

Service treatment records from the Veteran's periods of active duty and reservist service are negative for reported symptomatology or diagnoses related to a left groin disorder.

Following his first period of active duty service, the Veteran sought treatment in July 2007 for left groin symptomatology. VA treatment records dated at this time include his report of worsening left groin pain with a "knot" in that area that began after a fall. The Veteran reported later that month that he incurred the left groin injury a couple of years prior. The physical examination resulted in a diagnosis of left groin pain, possible muscle strain or pull.

VA records reflect the Veteran's request in August 2010 for a physical therapy consultation due to increased pain and swelling of his left groin.

In October 2012, the Veteran underwent a VA examination with respect to his claim. Following the physical examination and review of the record, the examiner provided a diagnosis of left groin strain in 2005, and the examiner determined that this was a temporary condition with ongoing residuals that had resolved. The clinical examination failed to reveal any current findings significant to the Veteran's left groin. The associated radiologic examination of the Veteran's hips and pelvis was unremarkable. Based on the examination and review of the claims file, the examiner opined that it is less likely than not that the Veteran's left groin condition is etiologically related to his military service. In rendering this opinion, the examiner highlighted that the service treatment records were negative for findings or complaints of a thigh or groin condition. The examiner also noted the Veteran's denial of any recent treatment or any current problems with the claimed disorder. 

Although the October 2012 VA examination report shows that the Veteran's left groin disorder had resolved, the examiner did determine that the Veteran had a left groin strain in 2005. The history reported by the Veteran for clinical purposes in July 2007, prior to the filing of his claim for service connection in April 2008, dates the onset of the left groin strain to his first period of active duty. Left groin symptoms caused the Veteran to seek additional treatment in August 2010. Thus, the Board is satisfied that the left groin strain began in service and was present when the Veteran filed his claim for service connection. Accordingly, service connection is warranted for the left groin strain.

Legal Criteria for Initial Rating Claim

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4 (2013). The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during active service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

In initial rating claims, the Board must discuss whether "staged ratings" are warranted, and if not, why not. Fenderson v. West, 12 Vet. App. 119 (1999). 

PTSD is evaluated under the provisions of 38 C.F.R. § 4.130, Diagnostic Code 9411.

A 50 percent evaluation is warranted for PTSD when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships.

A 70 percent evaluation is warranted where there is objective evidence demonstrating occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to suicidal ideation; obsessional rituals which interfere with routine activities, speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, or effectively; impaired impulse control, such as unprovoked irritability with periods of violence; spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances, including work or a work-like setting; and the inability to establish and maintain effective relationships.

A maximum 100 percent evaluation is for application when there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name.

In evaluating the evidence, the Board also considers the Global Assessment of Functioning (GAF) scores assigned during the period on appeal. The GAF is a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed.) (DSM-IV); Carpenter v. Brown, 8 Vet. App. 240 (1995). GAF scores ranging from 61 to 70 reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. Scores ranging from 51 to 60 reflect moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995).

Factual Background and Analysis- PTSD

In accordance with 38 C.F.R. §§ 4.1, 4.2 (2013) and Schafrath v. Derwinski, 1 Vet. App. 589 (1991), the Board has reviewed all evidence of record pertaining to the history of the Veteran's PTSD. The Board has found nothing in the historical record which would lead to the conclusion that the current evidence of record is not adequate for rating purposes. Moreover, the Board is of the opinion that this case presents no evidentiary considerations which would warrant an exposition of remote clinical histories and findings pertaining to this disability.

In response to his claim for service connection for PTSD, the Veteran was afforded a VA examination in May 2008. At that time, he endorsed symptoms of nightmares, poor attention span, an aversion to crowds, hypervigilance, and startle symptoms. The Veteran described having episodes of anger approximately every week or two during which he shouted, cursed, and hit the wall. The Veteran's wife was present during the examination, and she informed the examiner of times when the Veteran "gets mean." The Veteran stated that he had a good relationship with his children and that he had a normal social life that included friends and family outings. He identified his leisure activities as involving family and friends and stated that he was able to engage in a normal range and variety of activities of daily living. The examiner reviewed the claims file and noted that the Veteran attended counseling but did not use medication to treat his symptoms; the examiner stated this suggested that the Veteran's symptoms were mild. 

On the clinical examination, the Veteran was cheerful, oriented, and well-groomed.
His thought processes were logical, coherent, and relevant. The Veteran did not exhibit any impairments in his speech, reasoning, psychomotor functioning, verbal comprehension, or concentration. He denied having any suicidal or homicidal thoughts. The Veteran described his short-term memory as poor and relayed episodes when he forgot where he was going or what his wife had said. However, the examiner did not report any clinical findings related to any memory impairments. The examination revealed symptoms of anxiety with some depression, insomnia, appetite disturbance, anhedonia, racing thoughts, and a tendency to procrastinate. The Veteran's symptoms also included irritability with some anger-control problems towards people at work. However, the Veteran stated that he was able to isolate himself from his co-workers and that he had not missed any time from work due to mental problems. The examiner determined that the Veteran's anger and irritability sometimes interfered with his social functioning. 

Based on clinical test results, the May 2008 VA examiner characterized the Veteran's PTSD as mild and listed the Veteran's GAF score as 65-70. The examiner acknowledged that the Veteran frequently experienced symptoms of PTSD but concluded that the Veteran either tolerated his frequent symptoms or exaggerated his symptomatology. In so stating, the examiner noted that the results of one of the psychometric assessments administered to the Veteran failed to show any significant psychopathology. According to the examiner, individuals who scored similarly on the assessment tend to be alert, capable, optimistic, and effective at living. 

In May 2008, the Veteran attended a VA individual psychotherapy session with his wife, during which she expressed concern regarding his outbursts of anger. The associated mental status examination was negative for impairments in the Veteran's orientation or dress. His eye contact was within normal limits, and he was cooperative. The Veteran's mood was predominately anxious, and his emotional expression was somewhat constricted. There was no impairment noted with his thinking or thought processes, and there were no obvious signs of psychosis. The Veteran denied any homicidal or suicidal thoughts, and his memory was intact. A GAF score of 60 was assigned.

VA records show that the Veteran received regular treatment for his PTSD. Psychology notes dated in February and August of 2009 reflect his reports of having continued verbal outbursts and outbursts of anger, especially at work. On the mental status examinations, he was alert, cooperative, and presented with adequate hygiene. His mood was described as predominately anxious and agitated. His emotional expression was somewhat constricted. The Veteran was oriented, and his memory appeared to be intact. There was no impairment noted with the Veteran's thinking. He did not report any suicidal or homicidal thoughts at that time, and there was no evidence of obvious delusions, hallucinations, or signs of psychosis. The records of these examinations show GAF scores of 58 and 60.

VA records dated from January 2010 to October 2012 show additional treatment of the Veteran's psychiatric disability. In January 2010, he reported that he was getting along better with his co-workers and his wife. Collectively, these records show that the Veteran continued to endorse anxious and depressive symptoms that included re-experiencing traumatic events, avoidant behavior, and hyperarousal. The associated clinical examinations were negative for evidence of impaired thinking, orientation, speech, memory, or judgment. There were no signs of psychosis. His emotional expression was somewhat constricted, and his mood was predominately anxious, depressed, and agitated. The Veteran did not report having any suicidal or homicidal thoughts. His GAF score for this time period was reported as 60. 

The Veteran most recently underwent a VA examination in November 2012, at which time the examiner reviewed the record. The Veteran's PTSD was manifested by symptoms of anxiety, suspiciousness, chronic sleep impairment, and difficulty establishing and maintaining effective work relationships. Specifically, the Veteran endorsed symptoms of increased nightmares, hypervigilance, recurrent thoughts, being easily startled, and irritability. He was noted to be married, to get along with his family, and to have worked as an oil well servicer for the same employer for twelve years. He stated that he still had some problems getting along with people at work; however, he was able to isolate himself at work and had never been written up. According to the examiner, the Veteran's report was suggestive of very mild, if any, functional difficulty on the job related to his mental health issues. The Veteran reported having four or five good friends and to have a normal social life. He was able to care for himself independently.

The mental status examination revealed that the Veteran was well groomed, oriented, and cooperative. The examiner commented that it was somewhat difficult to establish a rapport with the Veteran, as he seemed more guarded as compared to the previous VA examination. His social skills were fair to poor, and his affect was somewhat irritable. The Veteran's thought process was logical and coherent, and his psychomotor functioning was within normal limits. His reasoning and judgment were fair. With regard to his concentration, he reported that he "daydream[ed]" at times, mostly at home, but this did not impact his work performance. He denied any significant memory loss. The examiner commented that the Veteran's mental status appeared to be somewhat different than as described during the last VA examination, as he appeared to be more somber, gruff, and less spontaneous. He presented with a somewhat flat stare during most of the examination. The examiner stated that the Veteran's PTSD symptoms appeared to have increased in severity and frequency following his return from a second military deployment and his re-initiation of psychiatric treatment. The examiner determined, however, that the Veteran's symptoms continued to have limited impact on his social and occupational functioning from an objective standpoint. In making this determination, the examiner highlighted the Veteran's denial of any psychosis, mania, panic, a history of suicidal or homicidal thoughts, or clinical depression. The examiner stated that the Veteran's overall test results were reflective of more significant pathology on the present examination, as the test results were reflective of more severe mood issues, agitation, anger, and some possible emerging bipolar symptomatology. The examiner characterized the Veteran's occupational and social impairment as impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily with normal routine behavior, self-care and conversation. 

VA medical records show that the Veteran and his wife attended family psychotherapy in February and July of 2013. His wife described the Veteran's episodes of disrupted sleep, road rage, and avoidance of social events. Objective testing did not reveal any impairments with the Veteran's attire or hygiene. His demeanor was reserved/anxious, and there was no impairment noted with his speech or thought processes. His emotional display was constricted with a blunted intensity. He denied any suicidal or homicidal thoughts. The insight of his circumstances was personalized or at a situational level. The Veteran's judgment was intact. The examiner assessed the Veteran has having persistent symptoms of hyperarousal and re-experiencing. 

During VA psychology consultations in June 2013 and from April to January 2014, the Veteran reported symptoms of feeling vigilant/tense and "on guard." He reported his favorite activities as exercising and listening to music. He reported having sleep disruptions and experiencing anxiety associated with the occurrence of nightmares. On the clinical examinations, the Veteran was neatly groomed, with a tense and restless posture. His demeanor was reserved/anxious. The Veteran's speech was clear, coherent, and concise, with a linear progression of thoughts. He denied any suicidal or homicidal ideations. The Veteran's insight for his circumstances was personalized and his judgment was intact. He was assessed as having symptoms of hyperarousal, avoidance, and re-experiencing. The January 2014 clinical assessment revealed some regression in the Veteran's functioning secondary to identified family and work stressors. 

The Veteran reported having continued psychiatric symptoms during a February 2014 VA psychotherapy session, to include feeling vigilant or tense, sleep disturbances, and anxiety associated with nightmares. He reported that he was being trained to work as a supervisor over a drilling crew and expressed difficulty being around people that he did not trust. Reportedly, his family stressors had subsided. The objective assessment showed that the Veteran was neatly groomed and that his demeanor was reserved/anxious. There was no evidence of impairment in speech, orientation, thought processes, or judgment. The Veteran did not report any suicidal or homicidal thoughts. His insight for his circumstances was personalized and influenced by projective mechanisms. The examiner determined that the Veteran continued to exhibit a regression in functioning secondary to work stressors. He was also noted to still exhibit symptoms consistent with hyperarousal, avoidance, and re-experiencing. 

In March 2014, the Veteran reported experiencing increased anger, irritability, and/or resentment. He continued to report feeling tense or vigilant. He stated that his family relationships had improved. Objective assessment revealed that the Veteran was neat in appearance and presented with a reserved/anxious demeanor. There was no impairment in his speech. The Veteran did not report any suicidal or homicidal thoughts. His judgment was intact, and his insight for his circumstances was personalized and influenced by projective mechanisms. The examiner determined that stabilization of the Veteran's functioning had occurred with respect to his work stressors. The Veteran's symptoms were again noted to include nightmares, hyperarousal, avoidance, and re-experiencing. 

Having carefully reviewed the evidence of record, the Board concludes that a disability rating higher than 50 percent is not warranted for the Veteran's PTSD at any time during the rating period on appeal. The Veteran's PTSD has not been manifested by impairment more nearly approximating occupational and social impairment with deficiencies in most areas to warrant a 70 percent rating under Diagnostic Code 9411. There is no evidence that the Veteran has had suicidal ideations and obsessional rituals have not been identified during any VA psychiatric examinations or treatment. His speech has been normal and not been shown to be intermittently illogical, obscure, or irrelevant. The evidence of record does not show that he experiences panic attacks and regular depression, near-continuous panic or depression affecting the ability to function independently, appropriately and effectively. The evidence shows that the Veteran has experienced anger, irritability, angry outbursts, and episodes where he would hit the wall. However, there is no showing that the Veteran's anger and irritability have resulted in any episodes of violence or that these symptoms are best characterized by unprovoked irritability with periods of violence . 

Additionally, the Veteran has regularly been found to be oriented during VA examinations and treatment, and spatial disorientation has not been shown. Moreover, the evidence does not show neglect of personal appearance and hygiene, both of which have regularly been shown to be normal. 

Furthermore, the evidence does not reflect a difficulty in adapting to stressful circumstances such as in a work or a work-like setting. Here, the evidence shows that the Veteran had a long career with an oil well company and has even received training to work as a supervisor. Although he reported difficulty getting along with his co-workers, the Veteran has demonstrated an ability to adapt to this stress by isolating himself at work. 

Regarding his social functioning, he has maintained effective relationships with his wife and family and has reported having a normal social life and good friends. Therefore, it cannot be said that the Veteran is unable to maintain effective relationships. 

The Board recognizes that the Court has held that the symptoms enumerated under the schedule for rating mental disorders are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular disability rating. See Mauerhan v. Principi, 16 Vet. App. 436 (2002). In this case, the record does not show other symptoms indicative of more occupational and social impairment than that contemplated by the currently assigned rating of 50 percent. 

The Board notes that the GAF scores assigned to the Veteran during the rating period on appeal are consistent with the 50 percent evaluation for PTSD. Since the initial grant of service connection, the Veteran's PTSD has been assigned GAF scores ranging from 58 to 70, reflecting impairment in the moderate to mild range. These GAF scores, along with the other clinical and lay evidence of record, show that the 50 percent rating currently assigned for the Veteran's PTSD is appropriate. 

In reaching this determination, the Board has considered whether staged ratings are appropriate in this case. In so doing, the Board acknowledges the November 2012 VA examiner's comment that although the Veteran's psychiatric symptomatology appeared to have increased in severity since following his deployment during his second period of active duty, his disability continued to have limited impact on his social and occupational functioning. Thus, although the severity of the Veteran's PTSD symptoms may have increased during the pendency of the claim, the evidence does not show that it has increased enough to warrant a higher rating at any time during the initial rating period. Therefore, staged ratings are not warranted.

The Board has also considered whether this claim should be referred to the Director of the Compensation and Pension Service for extra-schedular consideration. In determining whether a case should be referred for extra-schedular consideration, the Board must compare the level of severity and the symptomatology of the claimant's disability with the established criteria provided in the rating schedule for disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is therefore adequate, and no referral for extra-schedular consideration is required. Thun v. Peake, 22 Vet. App. 111, 115 (2008).

The symptoms and impairment from the Veteran's PTSD are consistent with those contemplated by the applicable schedular criteria. Therefore, referral for consideration of an extra-schedular rating is not warranted.


ORDER

Entitlement to service connection for a left groin disability, diagnosed as a strain, is denied.

Entitlement to an initial rating higher than 50 percent for PTSD is denied. 


REMAND

Unfortunately, additional development is needed with respect to the Veteran's claim for service connection for a left ankle disability.

The Veteran claims to have injured his left ankle during his military service. Service treatment records from the Veteran's reservist service show that he sustained a left ankle strain in February 2004, prior to his first period of active duty. Service treatment records dated during his first period of active service show that he received treatment for left ankle pain, was diagnosed with a left ankle sprain in December 2004, and was given a temporary profile in June 2005 due to left ankle pain. The record also indicates that the Veteran sustained a left ankle strain in January 2005 during his second period of active duty.

A January 2012 VA examination report reflects a diagnosis of left ankle sprain; the examiner did not offer an opinion as to the etiology of the disorder.

The Veteran underwent an additional VA examination in October 2012 and was given a diagnosis of in-service left ankle strains in 2005 and 2011, temporary condition with incidental radiographic finding of talar beaking defect. In reviewing the Veteran's medical records, the examiner noted the Veteran's history of left talar beaking, left ankle sprain injury in January 2005 during the first period of active service, and a diagnosis of left ankle sprain injury worsened by talar defect in 2011 during the second period of active duty. The examiner opined that it is less likely as not that the Veteran's left ankle condition is etiologically related to his military service. As rationale for this opinion, the examiner noted that the earliest radiographic evidence of the talar beaking condition was seen in April 2005 and the condition contributes to his left ankle pain. The examiner determined that it is less likely than not that the condition had time to form during active duty service after the Veteran's January 2005 left ankle injury. 

The Board finds numerous flaws with the October 2012 VA examiner's opinion. First the opinion does not address the diagnosis of a left ankle strain in February 2004 and whether the Veteran had a left ankle disorder that preexisted his first period of active duty service. Second, the opinion does not address the re-injury of the Veteran's ankle in 2011 during his second period of active service and whether the claimed disorder is related to this in-service injury. Lastly, the October 2012 examiner did not discuss or reconcile the January 2012 diagnosis of a left ankle strain and whether this diagnosis is etiologically related to any period of active duty or reservist service. When VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). Given the deficiencies in the October 2012 VA examination report, a remand is required to afford the Veteran an adequate VA examination to determine the nature and etiology of the claimed left ankle disorder.

Moreover, the Board finds that the left ankle claim is inextricably intertwined with the issue of service connection for a left foot disorder that is being referred to the AOJ. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991) (holding that issues are inextricably intertwined and must be considered together if one claim could have a significant impact on the other). Specifically, the October 2012 VA opinion, along with other medical evidence, indicates a possible relationship between the Veteran's left ankle symptomatology and the talar beaking condition. Thus, it would be premature to adjudicate the claim for service connection for a left ankle disorder before appropriate action is taken with regard to the left foot disorder claim. 

Accordingly, this case is REMANDED to the RO or the Appeals Management Center (AMC), in Washington, D.C., for the following actions:

1. The RO or the AMC should undertake appropriate development to obtain all outstanding records pertinent to the Veteran's claim, to include all records of any VA kinesiotherapy for the left ankle in 2011.

2. Then, the RO or the AMC should arrange for the Veteran to be scheduled for a VA examination by a physician with sufficient expertise who has not previously examined the Veteran to determine the etiology of the claimed left ankle disorder. The electronic record or a copy of all pertinent evidence in the electronic record must be made available to and reviewed by the examiner. The RO or the AMC should inform the examiner of the dates of the Veteran's active duty service and periods of ACDUTRA and INACDUTRA. 

The examiner should identify all left ankle disorders present during the period of the claim. For all left ankle disorders diagnosed during the pendency of the claim, the examiner should comment on the following:

(A) Whether it is at least as likely as not (50 percent or greater probability) that the left ankle disorder began during a period of active service, during a period of ACDUTRA or INACDUTRA service, or is related to any incident of service, to include any left ankle diagnoses or symptomatology documented in the service treatment records.

(B) IF AND ONLY IF the examiner does NOT find that any left ankle disorder is etiologically related to any periods of ACDUTRA, INACDUTRA, or active duty service, the examiner should state an opinion as to whether the disorder was present during the Veteran's period of active service from June 2004 to August 2005 or period of active service from November 2010 to December 2011. If so, the examiner should state an opinion as to whether the disorder clearly and unmistakably existed prior to the period of active service and clearly and unmistakably underwent no permanent increase in severity as a result of the period of active service.

In providing the requested the opinions, the examiner should acknowledge and discuss the findings in the January 2012 and October 2012 VA examination reports/medical opinion and any lay statements from the Veteran regarding the in-service onset and progression of the claimed disorder. 

The supporting rationale for all opinions expressed must be provided. If the examiner is unable to provide any required opinion, he or she should explain why.

3. The RO or the AMC should also undertake any other development it determines to be warranted. 

4. Then, the RO or the AMC should readjudicate the claim. If the benefit sought on appeal is not granted to the Veteran's satisfaction, the RO or the AMC should furnish to the Veteran and his representative a supplemental statement of the case and afford them the requisite opportunity to respond. Thereafter, the case should be returned to the Board for further appellate action.

By this remand, the Board intimates no opinion as to any final outcome warranted.

The Veteran need take no action until he is otherwise notified, but he may furnish additional evidence and/or argument during the appropriate time frame. See Kutscherousky v. West, 12 Vet. App. 369 (1999).

This REMAND must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2013).



______________________________________________
Shane A. Durkin
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs